CC: PTS +3copies.
USA
USM
DJ (CRM)

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

OCT 1 5 2004

| UNITED STATES OF AMERICA, | No. 03-10197 |
|---|---|
| Plaintiff - Appellee, | D.C. No. CR-02-00280-HG |
| V. | |
| GABRIEL BUCHER, | **JUDGMENT** |
| Defendant - Appellant. | |

Appeal from the United States District Court for the District of Hawaii (Honolulu).

This cause came on to be heard on the Transcript of the Record from the United States District Court for the District of Hawaii (Honolulu) and was duly submitted.

On consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the said District Court in this cause be, and hereby is **AFFIRMED**.

Filed and entered Tuesday, July 20, 2004

A TRUE COPY
CATHY A. CATTERSON
Clerk of Court
ATTEST

OCT 1 0 2004

by: R. Roberts
Deputy Clerk

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

GABRIEL BUCHER,
    *Defendant-Appellant.*

No. 03-10197
D.C. No.
CR-02-00280-HG
OPINION

Appeal from the United States District Court
for the District of Hawaii
Helen Gillmor, District Judge, Presiding

Argued and Submitted
May 6, 2004—Honolulu, Hawaii

Filed July 20, 2004

Before: Jerome Farris, John T. Noonan, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Farris;
Dissent by Judge Noonan

## SUMMARY

### Criminal Law and Procedure/Criminal Acts

UNITED STATES v. BUCHER  963

Appellant Gabriel Bucher was charged with interfering with park rangers in the exercise of their duties in violation of § 2.32(a)(1) for returning to a trail after being instructed by Haleakala National Park Ranger Michael Boxx not to do so. Boxx had given this order because he did not want Bucher to warn Robert Jacobs, another person on the trail, that park rangers intended to arrest Jacobs. Boxx saw Bucher return to the trail and watched Bucher walk down the trail and huddle with Jacobs about a quarter mile from the trail head. Seeing this, the rangers decided to intercept Jacobs on the trail. As they approached Jacobs and Bucher, Jacobs suddenly fell to the ground, slipping into an apparent unconscious state. The rangers attended to Jacobs at the scene and called for an ambulance. After evacuating Jacobs from the park, the rangers concluded that he had feigned unconsciousness, apparently to avoid arrest. After a bench trial, a magistrate judge found Bucher guilty and fined him $35. Bucher appealed to the district court, which affirmed his conviction.

Bucher appealed, arguing that § 2.32(a)(1) did not apply to him because he did not interfere with the park rangers themselves, but only indirectly with their official duties by disobeying the order to leave.

[1] Section 2.32(a)(1) prohibits intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty. [2] To interpret a regulation, courts look first to its plain language. The term "interfere" was unambiguous and means to oppose, intervene, hinder, or prevent. Similarly, "interference" means an act of meddling in another's affairs. Under these definitions, it was impossible to separate government employees from their duties under § 2.32(a)(1). One who interferes with an employee's official duties meddles in that employee's affairs, thus interfering with the employee herself. Similarly, one who interferes with a government employee who is engaged in an official duty has necessarily compromised the performance of those duties. By its plain language,

§ 2.32(a)(1) criminalizes interference with employees and their duties. [3] The focus on government operations—as opposed to the employees themselves—revealed that the regulation's goal was to protect and enable government functions and to protect the employees who perform them. [4] Bucher actively meddled in the rangers' effort to arrest Jacobs. Bucher's conduct fell squarely within § 2.32(a)(1)'s prohibition against interfering.

[5] Section 2.32(a)(1) requires proof of a specific intent to interfere with a government agent. Bucher walked down the trail and spoke to Jacobs within minutes of learning that the rangers planned to arrest him. From this, any rational fact finder could conclude that he: (1) returned to the trail to help Jacobs avoid arrest (2) warned Jacobs of the rangers' intent, which, (3) enabled Jacobs to concoct and mentally rehearse his performance. Although there was no direct evidence of what he actually said to Jacobs, it was reasonable to conclude a warning was delivered based on what Bucher knew before the conversation and on what Jacobs did shortly afterward. Circumstantial evidence establishes an intent to interfere. [6] The evidence also established that Bucher hindered the rangers' arrest efforts. Bucher's conversation with Jacobs validated Boxx's concern that he would meddle in the investigation, leading the rangers to try and intercept Jacobs on the trail. Furthermore, by "playing possum"—an act likely facilitated by Bucher's warning—Jacobs stalled the arrest process. Bucher's intentional acts thus set in motion a chain of events that interfered with the rangers and their official duties of investigating and arresting Jacobs. The evidence was sufficient. The judgment of the district court had to be affirmed.

Judge Noonan dissented, writing that no testimony supported the majority's supposition that Bucher's words led Jacobs to feign fainting and play possum; it was not any service to justice to uphold a conviction on the basis of a scenario unsupported by the evidence.

## COUNSEL

Alexander Silvert, First Assistant Federal Defender, and Peter C. Wolff, Jr., Federal Public Defender, District of Hawaii, Honolulu, Hawaii, for the defendant-appellant.

Louis A. Bracco, Assistant U. S. Attorney, and Edward H. Kubo, Jr., United States Attorney, District of Hawaii, Honolulu, Hawaii, for the plaintiff-appellee.

## OPINION

FARRIS, Circuit Judge:

A police officer comes to a mother's home to arrest her son. He isn't there. She later notifies the son that police want to arrest him. Should she be guilty of anything other than possibly loving a son who may not deserve it? What about a motorist who warns other motorists that they are entering a police "speed trap"? The price will prove extremely high if reasonable human conduct becomes criminal. However, the line between reasonable conduct and conduct that interferes with the performance of official conduct must be drawn.

Gabriel Bucher recognizes that he failed to obey a national park ranger's command that he leave a National Park trail and that a regulation made such conduct unlawful. He vigorously contends that he did nothing to "interfere" with the rangers in the exercise of their duties, and that he was wrongly charged with violating 36 C.F.R. § 2.32(a)(1)(2000). His confusion is understandable, but also misplaced. By walking down the trail to warn a person whom the rangers intended to arrest, he did interfere with both the rangers and their official duties.

Bucher argues that there is no direct evidence of what he said when he spoke to the person and therefore, it cannot be assumed that he warned the person of the rangers' intent. This, he reasons, precludes a finding that he interfered. Bucher's argument ignores the truth of fact finding — facts *and* reasonable inferences from those facts are the province of the trier of fact. What he said can only be known to the listener, but nothing precludes a ranger or a finder of fact from drawing reasonable inferences from what was observed.

## BACKGROUND

The night of April 26, 2001, rangers patrolling the Haleakala National Park met 14 hikers staying at a cabin on a trail about five miles from the nearest road. When they noticed several persons with marijuana, the rangers cited those who did not relinquish their contraband, then left the group to complete its trip.

That evening, Ranger Michael Boxx discovered that one of the hikers cited, 79-year-old Robert Jacobs, had given a false name. Aware of the group's plan to complete its hike the next day, Boxx and other rangers went to the trail head parking lot in the morning to wait for Jacobs to arrive so they could arrest him.

While the rangers were staking out the trail head, one of the hikers, Gabriel Bucher, emerged from the trail. Boxx informed Bucher why they were there and asked where Jacobs was. Bucher indicated that he was 15 to 20 minutes behind him on the trail. Boxx told Bucher he was free to leave, but instructed him not to return to the trail. Boxx later testified that he gave this order because he "did not want [Bucher] to warn Mr. Jacobs of what we had intended for him so that it would not prolong the investigation with him going back into the crater and us following him."

About five minutes later, Boxx noticed that Bucher had left the parking lot and returned to the trail. Through binoculars, he watched Bucher walk down the trail and huddle with

Jacobs about a quarter mile from the trail head. Seeing this, the rangers decided to intercept Jacobs on the trail. As they approached Jacobs and Bucher, Jacobs suddenly fell to the ground, slipping into an apparent unconscious state. The rangers attended to Jacobs at the scene and called for an ambulance. After evacuating Jacobs from the park, the rangers concluded that he had feigned unconsciousness, apparently to avoid arrest.

For his role, Bucher was charged with intentionally interfering with a government employee or agent engaged in an official duty under 36 C.F.R. § 2.32(a)(1) (2000), a misdemeanor. After a bench trial, a magistrate judge found Bucher guilty and fined him $35. Bucher appealed to the district court, which affirmed his conviction. He appealed. We affirm.

## DISCUSSION

1. *Scope of 36 C.F.R. § 2.32(a)(1).*

Bucher first contends the district court erred in ruling that the regulation under which he was charged applied to his conduct. A district court's interpretation of a regulation is reviewed de novo. *United States v. Willfong,* 274 F.3d 1297, 1300 (9th Cir. 2001).

[1] Section 2.32 of Title 36 C.F.R., entitled "Interfering with Agency Functions," provides in relevant part:

 (a) The following are prohibited:

  (1) Interference. Threatening, resisting, intimidating, or *intentionally interfering with a government employee or agent engaged in an official duty,* or on account of the performance of an official duty.

(Emphasis added.) Armed with a quiver of statutory construction rules, Bucher argues that § 2.32(a)(1) did not apply to

UNITED STATES v. BUCHER   9635

him because he did not interfere with the park rangers themselves, but only indirectly with their "official duties" by disobeying the order to leave. He argues that the plain language of the regulation limits its application to acts that directly interfere "with a government employee [personally], not with the duty that the employee is carrying out." Bucher's reading of § 2.32(a)(1) is not reasonable.

[2] To interpret a regulation, we look first to its plain language. *United States v. Hagberg,* 207 F.3d 569, 574 (9th Cir. 2000) (citing *Reno v. National Transp. Safety Bd.,* 45 F.3d 1375, 1379 (9th Cir. 1995)). As with legislation, we presume the drafters said what they meant and meant what they said. *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992). If the regulation is unambiguous, its plain meaning controls unless such reading would lead to absurd results. *Reno,* 45 F.3d at 1379. The term "interfere" is unambiguous and is defined as "to oppose, intervene, hinder, or prevent." *Willfong,* 274 F.3d at 1301 (quoting WEBSTER'S NEW WORLD DICTIONARY 704 (3d College ed. 1998)). Similarly, "interference" means an "act of meddling in another's affairs . . . [a]n obstruction or hindrance." Black's Law Dictionary, 818 (7th ed. 1999). Under these definitions, it is impossible to separate government employees from their duties under § 2.32(a)(1). One who interferes with an employee's official duties "meddles" in that employee's "affairs," thus interfering with the employee herself. Similarly, one who interferes with a government employee who is engaged in an official duty has necessarily compromised the performance of those duties. By its plain language, § 2.32(a)(1) criminalizes interference with employees and their duties.

[3] That the employee and his duties occupy two sides of the same coin is reflected in the regulation's purpose. When the regulation was enacted in 1983, the National Park Service stressed that § 2.32(a) "is necessary to ensure that *government operations* proceed without interference." 48 Fed. Reg. 30252, 30270 (June 30, 1983) (emphasis added). Although it

rejected more sweeping prohibitions that were proposed, the Service also commented, "the prohibitions in [§ 2.32] were narrowly drafted and intended to give the Service the authority it needs to ensure that *government operations* proceed without interference." 48 Fed. Reg. 30252, 30259 (June 30, 1983) (emphasis added). The focus on government operations regulation to be read so that none of its terms are rendered — as opposed to the employees themselves — reveals that the regulation's goal is to protect and enable government functions and to protect the employees who perform them.

We have recently interpreted analogous regulatory language in this way. In *United States v. Willfong*, the defendant disobeyed a Forest Service agent's order to cease logging operations on Forest Service land. He was charged under 36 C.F.R. § 261.3(a), which, like § 2.32(a)(1), prohibits "interfering with any forest officer engaged in or on account of the performance of his official duties. . . ." 274 F.3d at 1299-30. Concluding the term "interfering" is unambiguous, we held that Willfong's failure to obey the order violated § 261.3(a) because the continued logging activity interfered with the agent's effort to enforce the "shut-down" order. *Id.* at 1301.

Bucher contends that both *Willfong* and the district court in this case misread "interfering" because, in both regulations, that term is grouped with "threatening," "resisting," and "intimidating." 36 C.F.R. § 2.32(a)(1); 36 C.F.R. § 261.3. Since those terms connote acts that involve direct confrontation between two people, Bucher argues, "interfering" should be similarly read to mean direct physical or verbal action that obstructs the agent herself. Such reading, he contends, is required under the rule of *noscitur a sociis*, which provides that "words grouped in a list should be given related meaning." *Dole v. United Steel Workers of America*, 494 U.S. 26, 37 (1990) (citation omitted).

As the majority in *Willfong* noted, however, such construction rules do not apply since "interfering" is unambiguous, and because "threatening, resisting intimidating, or intention-

ally interfering" are stated disjunctively so that proof of any one of the acts alone constitutes an offense. 274 F.3d at 1303 (citing *United States v. Hoff*, 22 F.3d 222, 223 (9th Cir. 1993)). Since the terms denote separate and distinct criminal acts, another interpretation rule is invoked which requires the regulation to be read so that none of its terms are rendered redundant. *Kungys v. United States*, 485 U.S. 759, 778 (1988); *see also Boise Cascade Corp. v. United States EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991) (the use of different words in the same sentence of a statute signals an intent to distinguish between those words.) Bucher's reading of § 2.32(a)(1) conflates "interfering" and "resisting" so that they would cover essentially the same conduct.

Bucher also argues that since his act of "silently disobeying" Ranger Boxx's order to leave the trail was the basis for the charge, he should have been prosecuted under 36 C.F.R. § 2.32(a)(2), which prohibits "[v]iolating the lawful order of a government employee or agent authorized to maintain order and control public access and movement during . . . law enforcement actions. . . ." Applying the more general Subsection (a)(1) to him, Bucher argues, violates the rule that specific provisions of statutes and regulations must govern over general ones. *See NLRB v. A-Plus Roofing, Inc.*, 39 F.3d 1410, 1415 (9th Cir. 1994).

Whatever the overlap between Subsections (a)(1) and (a)(2), Bucher's argument is flawed. It wrongly assumes that his failure to obey was the sole basis for his conviction. Bucher not only disobeyed Ranger Boxx. He walked a quarter mile down the trail and spoke to the target of the rangers' investigation, after which that person employed a ruse designed to obstruct his arrest. Bucher's actions invoked Subsection (a)(2), which applies to a broader range of conduct.

[4] Since Bucher did more than disobey, his argument based on the dissent in *Willfong* is unpersuasive. The *Willfong* dissent argued that Willfong was not guilty of interference

because he did nothing to directly hinder the agent's duties — he simply disregarded an order and continued logging. 274 F.3d at 1304. The dissent further pointed out that disobeying an order could not be equated with "interference" because numerous regulations, including § 2.32(1), contain sections that specifically address disobedience separately and distinctly from other sections dealing with interference. *Id.* at 1306. Where Willfong merely persisted in cutting trees despite an order not to, Bucher actively meddled in the rangers' effort to arrest Jacobs. Thus, even if we were to adopt the *Willfong* dissent with regard to 36 C.F.R. § 2.32(a), it would not apply to these facts since Bucher's conduct falls squarely within Subsection (1)'s prohibition against interfering.

2. *Sufficiency of the Evidence.*

Bucher alternatively argues that, even accepting the district court's interpretation of 36 C.F.R. § 2.32(a)(1), there was insufficient evidence to prove he intentionally interfered with a government employee or agent engaged in an official duty. We review sufficiency claims de novo to determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Odom*, 329 F.3d 1032, 1034 (9th Cir. 2003).

[5] Section 2.32(a)(1) requires proof of a specific intent to interfere with a government agent. *United States v. Buehler*, 793 F. Supp. 971, 974 (E.D. Wash. 1992). "[C]ulpable intent . . . can be inferred from the defendant's conduct and from the surrounding circumstances." *United States v. Hernandez-Franco*, 189 F.3d 1151, 1155 (9th Cir. 1999) (quoting *United States v. Smith*, 962 F.2d 923, 931 (9th Cir. 1992)) (alteration in *Hernandez-Franco*). Here Bucher walked down the trail and spoke to Jacobs within minutes of learning that the rangers planned to arrest him. From this, any rational fact finder could conclude that he: (1) returned to the trail to help Jacobs

avoid arrest (2) warned Jacobs of the rangers' intent, which, (3) enabled Jacobs to concoct and mentally rehearse his performance. Although there is no direct evidence of what he actually said to Jacobs, it is reasonable to conclude a warning was delivered based on what Bucher knew before the conversation and on what Jacobs did shortly afterward. Circumstantial evidence establishes an intent to interfere.

[6] The evidence also establishes that Bucher hindered the rangers' arrest efforts. Bucher's conversation with Jacobs validated Boxx's concern that he would meddle in the investigation, leading the rangers to try and intercept Jacobs on the trail rather than wait for him in the parking lot. Furthermore, by "playing possum" — an act likely facilitated by Bucher's warning — Jacobs added hours to the arrest process by forcing the rangers to carry him off the trail, call and wait for an ambulance, and escort him to the hospital. Bucher's intentional acts thus set in motion a chain of events that interfered with the rangers and their official duties of investigating and arresting Jacobs. The evidence was sufficient.

**AFFIRMED.**

NOONAN, Circuit Judge, dissenting:

If Gabriel Bucher, after speaking to the ranger, had turned around to walk back farther down, and never reached his elderly friend Robert Jacobs, he might have been charged with disobeying the ranger's lawful order and conceivably he might have been charged with attempting to interfere with the ranger's performance of official duty. He could not have been charged with, or convicted of, actual interference because he would not have spoken to Jacobs. The evidence of interference in this case is no better.

According to the majority opinion, Bucher interfered with the rangers' duty by causing Jacobs to feign unconsciousness

for six to eight hours. Curiously, that remarkable piece of playacting was unknown to the government lawyer who prosecuted Bucher. It is fair to infer that Bucher spoke to Jacobs and told him of the ranger's plan. But did this warning interfere with rangers? The majority opinion engages in genuinely ingenious invention in supposing that Bucher's words led Jacobs to feign fainting and play possum. No testimony supports this imaginative scenario.

The trail Jacobs was on was five miles in length. It went steeply up from a crater. It takes "the average person" in good physical health three to four hours to hike out. Jacobs was only 20 minutes behind Bucher, so he must have been close to the trail's end and had been climbing up a sharp slope for over three hours. We have no information as to his health. We do know his age — 79. It is fair inference that a person of that age is not the average person hiking. Jacobs had been exercising strenuously for several hours.

According to the testimony that was elicited by the government from a ranger, at the time that Jacobs saw the rangers approaching, he "fell into an unconscious state." The rangers summoned an ambulance. It arrived after three or four hours. Jacobs was then taken to a hospital. According to the ranger: "After three or four hours, Mr. Jacobs decided that he would (inaudible) basically that he found out that we were going to stay there until the medical was cleared. Once he found out that he was not going to leave, he became suddenly well and was released from the hospital on his own recognizance." In short, 6 to 8 hours after his failing unconscious, Jacobs was found to be conscious and well enough to leave.

On cross-examination, the ranger testified: "By the time we got to Mr. Jacobs he was unconscious." The ranger was then asked as to Jacob's state when brought to the ambulance:

Q.  And he was unconscious that whole time?

A.  He was unconscious (inaudible).

Q.  Okay. But he was unconscious, he was faking being unconscious.

A.  It came to the medical people's attention that he was faking —

Q.  Being unconscious.

It is only Bucher's counsel who supplies the statement "he was faking being unconscious." The ranger only gives the information as to the belief of the medical people in the hospital 6 to 8 hours after Jacobs was removed from the trail. When the government had the chance to reexamine the ranger, this exchange took place:

Q.  So it was only after Mr. Jacobs talked to the defendant and then upon seeing you that he became or appeared to become ill?

A.  That's correct.

Q.  And the fact that Mr. Jacobs had this illness or feigned this illness — whichever it was — did that, what extra activity caused you to have to do?

A.  It caused us to call an ambulance and bring on a crew from the, from Kola and take to the hospital (inaudible) three or four hours of (inaudible).

Q.  Nothing further.

In short, with no testimony on direct that Jacobs feigned unconsciousness, the government on redirect explicitly referred to Jacobs either having an illness or feigning an illness, "whichever it was." It is truly remarkable that the prosecutor, knowledgeable about the facts, examining a percipient

Case 1:02-cr-00280-HG   Document 13   Filed 10/15/2004   Page 9 of 9

UNITED STATES v. BUCHER

witness as to what had happened, did not elicit any testimony that Jacobs was playing possum. That was left to the imagination of this court.

The facts testified to by the ranger are that between 6 to 8 hours after Jacobs appeared to be unconscious he revived at the hospital. That one could successfully bluff for such a long period deceiving experienced rangers, ambulance personnel, and hospital personnel is highly unlikely. In any event, 6 to 8 hours of bluffing was not testified to by any witness.

Suppose one assumes that Jacobs fainted when he saw the rangers because he knew through Bucher's warning that they were coming to arrest him. In that event, Bucher's warning would have interfered with the rangers' work. But one would reach that conclusion by one's initial assumption as to why Jacobs fainted. The conclusion is not supported by testimony, nor is it argued by the government.

The government does not contend that Bucher is to be held responsible for interfering with the ranger if the 79-year-old Jacobs, apprehensive at their appearance, became ill. Nor did the government emphasize the colorful playing possum theory advanced by my colleagues. The government's theory in its brief on this appeal is as follows:

Boxx (and the other Rangers) had planned to arrest Jacobs when he emerged from Crater Trail. Instead, because of Bucher's interference, the Rangers had to undertake the more difficult task of apprehending Jacobs along the precipitous trail. Had Jacobs successfully retreated to the crater floor, he might have received assistance from others, and/or prevented rangers from ascertaining his true identity (TR 16). Moreover, the (apparent) advance warning of impeding arrest removed the tactical element of surprise, and enabled Jacobs to feign unconsciousness, making his (eventual) arrest more problematic.

Just as no evidence supports the government's contention that Jacobs feigned unconsciousness on the trail, so no testimony supports the government's contention that the rangers were forced to change their plans to the disadvantage of their investigation. On that score, the ranger testified on cross-examination:

The only worries were that it would prolong the investigation if he went back into the crater.

But Jacobs did not go back into the crater or take any action to evade arrest.

*Conclusion*. It is a virtue of our judicial system that a $35 fine can be the subject of an appeal. It is a virtue of the members of this court that they can see and state the harshness of penalizing a man for warning his friend. It is not, however, any service to justice to uphold a conviction on the basis of a scenario unsupported by the evidence. I respectfully dissent.